IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| FOWERS FRUIT RANCH, LLC, et al., <br><br> Plaintiffs, <br><br><br> vs. <br><br><br> BIO TECH NUTRIENTS, LLC, <br><br> Defendant. | ORDER <br> AND <br> MEMORANDUM DECISION <br><br> Case No. 2:11-cv-00105-TC |

Defendant Bio Tech Nutrients, LLC (Bio Tech) filed a Motion to Strike Expert Witness Reports of Dr. Earl J. Seeley (Dkt. No. 55).  On January 13, 2015, the court heard testimony from Dr. Seeley to determine whether he qualifies as an expert under Rule 702 of the Federal Rules of Evidence and Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  The court ordered the parties to file supplemental briefing that addressed Dr. Seeley's testimony from the Daubert hearing.  On May 4, 2015, the court heard final arguments on the motion.  Having considered the parties' arguments and the applicable law, the court holds that Dr. Seeley may not offer expert opinions on the issues of projected crop yields, projected crop prices, and lost revenues for tart cherries.[1]  Accordingly, the court GRANTS Bio Tech's motion in part.

---

[1] In Bio Tech's briefing, nearly all of its analysis focuses on Dr. Seeley's opinions related to tart cherries.  In its initial motion, Bio Tech briefly argued that Dr. Seeley used inflated prices for other fruits allegedly damaged by Bio Tech's products.  (See Def.'s Mot. To Strike Expert Witness Reports of Dr. Earl J. Seeley at 33-37, Dkt. No. 55.)  But at the Daubert hearing, Bio Tech only addressed and presented evidence related to tart cherries.  Without evidence about other fruits, the court will not exclude opinions related to any fruit other than tart cherries.

## BACKGROUND[2]

Plaintiffs (collectively, "Fowers Fruit Ranch") seek to recover damages allegedly caused by the use of fertilizer products manufactured and sold by Bio Tech, particularly a product called BTN+. Fowers Fruit Ranch applied BTN+ to its orchards from 2008 to 2010. Fowers Fruit Ranch soon saw that many of its plants and trees were damaged. In the spring of 2010, Fowers Fruit Ranch asked several expert consultants to evaluate the damage. One of these consultants was Dr. Earl Seeley, who is now a retained expert witness for Fowers Fruit Ranch.

In his reports,[3] Dr. Seeley offers opinions related to physical damage to the orchard, the causal link between the damage and Bio Tech's products, the adverse effects of using BTN+ in place of other fertilizers, and the costs to replace damaged plants and trees. Bio Tech has not moved to exclude Dr. Seeley's testimony on these topics.

In addition to his other opinions, Dr. Seeley has projected future crop yields in the areas where Bio Tech's products were applied, future crop prices for fruit produced in those areas, and lost revenues based on those estimated yields and prices. Dr. Seeley summarizes his conclusions in spreadsheets attached to his original report. (Seeley Report at 30-36, Dkt. No. 55-1.) Fowers

---

[2] In this order, the court provides only the facts that are necessary to explain its decision. Additional background and context are provided in the court's order denying Bio Tech's motions for partial summary judgment. (See Order and Mem. Decision at 2-7, Dkt. No. 90.)

[3] Dr. Seeley's opinions were provided in four reports: an initial report (Dkt. No. 55-1); a first supplemental report (Dkt. No. 55-4); a second supplemental report (Dkt. No. 55-6); and a rebuttal report responding to the opinions of Bio Tech's experts (Dkt. No. 55-5). Responding to Bio Tech's motion, Dr. Seeley also submitted a declaration in which he explained some of the bases for his opinions in further detail. (Seeley Decl., Dkt. No. 63-2.) Although this declaration addresses some of the issues discussed by Bio Tech's expert, it does not provide the necessary information to support Dr. Seeley's opinions that are the subject of this motion. In particular, it does not describe Dr. Seeley's methodology or the facts and data used to form his opinions.

Fruit Ranch plans to use Dr. Seeley's testimony to show that a certain amount of fruit would have been grown each year, but because of the damage caused by Bio Tech's products, the orchard can no longer produce as expected.  Bio Tech challenges these opinions, arguing that Dr. Seeley is not qualified to calculate lost revenues for a business, he has not given a sufficient explanation of how he reached his conclusions, and his opinions are not supported by facts and data.

## ANALYSIS

Under the Federal Rules of Evidence, expert opinions are admissible if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.  Although the standard under Rule 702 is "liberal . . . regarding expert qualifications," United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995), "[t]he proponent of expert testimony bears the burden of showing that the testimony is admissible."  Conroy v. Vilsack, 707 F.3d 1163, 1168 (10th Cir. 2013).

To determine whether the proponent has met its burden, the court applies a two-part test. First, the court decides whether the witness is "qualified by knowledge, skill, experience, training, or education to render an opinion." Id. (quotations omitted); Fed. R. Evid. 702. "Second, if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable under the principles set forth in *Daubert*."  103 Investors I, L.P. v. Square D Co., 470 F.3d 985, 990 (10th Cir. 2006).

## I.    Dr. Seeley's Qualifications

In his reports, Dr. Earl Seeley provides expert opinions related to physical damage to the plants and trees at the Fowers Fruit Ranch orchard, the causal link between the damage he

observed and the use of Bio Tech's products, the adverse effects of using Bio Tech's products in place of other fertilizers, and the costs to replace damaged plants and trees and to otherwise restore the damaged portions of the orchard.  Dr. Seeley also responds to the opinions offered by Bio Tech's experts.  Finally, in spreadsheets attached to his reports, Dr. Seeley lists his estimates for future crop yields, anticipated crop prices, and lost revenues.

Fowers Fruit Ranch maintains that Dr. Seeley has ample education and experience to testify about all horticulture issues, including issues related to damages.  Dr. Seeley has a Bachelor's degree in horticulture; a Master's degree in mineral nutrition, biochemistry and horticulture, and botany; and a PhD in pomeology.[4]  Dr. Seeley has taught at Washington State University, Brigham Young University, and Utah State University.  He has also published extensively on horticulture issues.  Dr. Seeley has served on boards that deal with orchard-related issues and has worked as a consulting horticulturist for multiple growers.  In addition, Dr. Seeley has worked in management for two companies,  The Highland Partnership and Agri-Northwest, each of which own several orchards.

With his education and experience, the court agrees that "Dr. Seeley is qualified to opine on horticultural issues relating to the Fowers' Fruit orchards.  Those issues include all aspects of the physical damage to the fruit trees and orchard operations suffered by Plaintiffs from use of the BTN products."  (Pls.' Supplemental Opp'n to Def.'s Mot. to Strike Expert Witness Reports of Dr. Earl J. Seeley at 4, Dkt. No. 95.)  Bio Tech concedes that "Dr. Seeley may be qualified to offer opinions on horticulture issues."  (Def.'s Supplemental Mem. in Supp. of Mot. to Strike Dr.

---

[4] Pomeology is the study of pome fruits, which are fruits with a core of several small seeds surrounded by a tough membrane. The best example is an apple.

Seeley at 2, Dkt. No. 93.)  And at the <u>Daubert</u> hearing, Bio Tech confirmed that it is not challenging Dr. Seeley's qualifications to testify as a causation expert; Bio Tech only challenges Dr. Seeley's expertise in estimating future losses.  (Hr'g Tr. Vol. I at 3, Dkt. No. 94.)[5]

Bio Tech argues that Dr. Seeley has almost no economic training or experience and is therefore not qualified to testify about lost revenues.  When asked about his qualifications to calculate lost revenues of a business, Dr. Seeley confirmed that he is not certified in business valuation or as a certified public accountant.  (<u>Id.</u> at 5-6.)  Dr. Seeley has never taught, worked, or published in accounting or economics.  (<u>Id.</u> at 7.)  In the last ten years, Dr. Seeley has testified in only one case where he was asked to testify "as to the projected productivity and quality and value elements that are part of the economic equation in a loss analysis."  (<u>Id.</u> at 13.)

Fowers Fruit Ranch contends that Dr. Seeley has not been retained as an economic expert. Rather, Fowers Fruit Ranch relies on another expert, Richard Hoffman, and maintains that Mr. Hoffman is qualified to testify about lost revenues.[6]  Although Mr. Hoffman has calculated lost revenues for Fowers Fruit Ranch, a review of his report confirms that he relied heavily on Dr. Seeley's calculations of crop yields, prices, and lost revenues.  In his report, Mr. Hoffman states that he checked Dr. Seeley's calculations for accuracy.  (Hoffman Report at 6, Dkt. No. 95-1.)  In addition, Dr. Seeley testified that he gave Mr. Hoffman "reference sources so that [he] could test [Dr. Seeley's] numbers in quite a number of areas."  (Hr'g Tr. Vol. II at 63.)  Neither Dr. Seeley nor Mr. Hoffman identify the documents provided to Mr. Hoffman.  And, as explained below,

---

[5] The transcript of the <u>Daubert</u> hearing was prepared in two different sections. The court has identified the first portion as Volume I and the second as Volume II.

[6] Bio Tech has not challenged Mr. Hoffman's qualifications as an economic expert.

Dr. Seeley has not provided his underlying data to Bio Tech or to the court for review.  Although Mr. Hoffman has been designated to testify about lost profits, he adopted Dr. Seeley's numbers and identified Dr. Seeley as the expert on anticipated crop yields, prices, and revenues.

To establish Dr. Seeley's qualifications to testify in these areas, Fowers Fruit Ranch provided a document titled "Dr. Earl J. Seeley: Qualifications & Experience in Projecting Orchard Budgets and Establishment Costs."  (Seeley Supplemental Report at 25, Dkt. No. 55-4.) Dr. Seeley confirmed that this document is the only place where the court will find his experience that provides the foundation for his opinions on crop yields, crop prices, and lost revenues.  (Hr'g Tr. Vol. II at 14-16.)  The document states that, as manager of The Highland Partnership and Agri-Northwest, Dr. Seeley had the following job responsibilities that he considers relevant: participating in the selection of property to be developed; defining the development sequence; mapping the area to be developed; budgeting all capital inputs needed to develop the orchards; and executing all phases of preparations, planting, irrigation, and training. (Seeley Supplemental Report at 25.)  In addition, Dr. Seeley "has participated in the planning and budgeting of a number of replacement blocks and new plantings for clients."  (Id.)  At the Daubert hearing, Dr. Seeley further explained that he has prepared development proposals, which required him "to project the production year to year at a minimum through the depreciation period."  (Hr'g Tr. Vol. II at 60-61.)

Beyond stating that he has planned, budgeted, and managed several orchards, Dr. Seeley has not explained how his experience creates the ability to estimate future performance of particular crops within an orchard.  Dr. Seeley has not provided any of his previous budgets or development plans to compare with his projections in this case.  (Id. at 16.)  Dr. Seeley has not

identified any specific instances in which he has estimated future crop yields, prices, or revenues. When asked to identify "any published material of any kind that would explain for the court how you can take preparing budgets and translate that into projecting lost revenues of a business because of some adverse effect," Dr. Seeley could only testify that "[t]here is a great deal of information" and materials that "any expert dealing with losses in these areas would consult." (Id. at 16-17.)  But Dr. Seeley he did not cite these materials in his report and did not identify the materials when he testified.  (Id. at 17.)

Despite these problems, Dr. Seeley may be qualified to testify about future crop yields, crop prices, and lost revenues for tart cherries, given his extensive educational background and professional experience.  But even if Dr. Seeley has the necessary qualifications to testify about crop yields, prices, and revenue, Fowers Fruit Ranch has not established that Dr. Seeley's methodology is reliable.

## II.    Dr. Seeley's Methodology

If a witness is qualified to testify about a particular topic, the witness's opinions must still be reliable, or "based upon sufficient facts or data" and "the product of reliable principles and methods."  Fed. R. Evid. 702.  In determining reliability, the inquiry is "a flexible one."  Daubert, 509 U.S. at 594.  "[T]he court may consider several nondispositive factors," including "(1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community."  103 Investors I, 470 F.3d at 990 (citing Daubert, 509 U.S. at 593-954).  "Ordinarily, a key question to be answered in determining

whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." Daubert, 509 U.S. at 593.

To succeed against a Daubert challenge to an expert's methodology, the expert must adequately describe his or her methods. Indeed, an expert's report has been found insufficient under Daubert where it contained "no statement of methods, theories or techniques used by [the expert] in reaching his conclusions." Becker v. Kroll, No. 2:02-cv-24 TS, 2010 WL 273370, at *2 (D. Utah Jan. 22, 2010). Cf. Hark'n Techs., Inc. v. Crossover Symmetry, No. 1:10-cv-81, 2013 WL 653964, at *3 (D. Utah Feb. 21, 2013) (expert's methodology was sufficient where his report contained "a description of how he arrived at the incremental profit number, and the assumptions he used in arriving at that number").

The Federal Rules of Civil Procedure similarly require that an expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). "It is not sufficient that an expert report merely set forth the opinions the expert will offer; it must also describe the reasons and basis for those opinions. Expert reports must include 'how' and why' the expert reached a particular result, not just his conclusory opinion." Cohlmia v. Ardent Health Servs., LLC, 254 F.R.D. 426, 430 (N.D. Okl. 2008) (emphasis added). In Cohlmia, the challenged reports did not provide the data used or the process by which the experts reached their opinions. One of the experts testified that he relied on "publicly available materials," but he did not identify the materials or reference them in his report. Id. at 431. The court held that the reports did not satisfy the requirements of Rule 26 and granted a motion to strike the reports. Id. at 435.

Here, Dr. Seeley's reports do not disclose any methodology or data underlying his opinions about crop yields, crop prices, or lost revenues for tart cherries. Dr. Seeley's opinions on these topics are summarized in a spreadsheet attached to his reports, which includes estimates for "Expected Yield," "Actual Yield," "Value/unit," and "Revenue Loss/Gain." (Seeley Report at 30-32, Dkt. No. 55-1.) Although Dr. Seeley's report provides a brief definition for each category, the report does not describe Dr. Seeley's methodology, the data on which he relied, or how he applied his methodology to make his calculations. (See id.) Under Rule 26, Dr. Seeley's failure to describe his methodology requires the court to strike his spreadsheet for tart cherries.

Moreover, in response to questions about the spreadsheet at the Daubert hearing, Dr. Seeley did not provide the information missing from his report that would show how he reached his opinions for crop yields, crop prices, or lost revenues.

### A.    Crop Yields

Dr. Seeley's report contains two columns related to crop yields: Expected Yield and Actual Yield. According to Dr. Seeley, the numbers in the Expected Yield column show what the orchard would have produced absent the use of Bio Tech's products. (Hr'g Tr. Vol. I at 18.) The Actual Yield column gives Dr. Seeley's estimate of the sellable product that Fowers Fruit Ranch would harvest. (Id. at 20.) Dr. Seeley had actual data from Fowers Fruit Ranch for 2009 to 2012 but began projecting numbers in the Actual Yield column in 2013. (Hr'g Tr. Vol. II at 21, 62-63.) To make these projections and the projections for Expected Yield, Dr. Seeley testified that he used the "before and after" method,[7] which he described as follows:

---

[7] It appears that the before-and-after method is the only method that Dr. Seeley used in estimating crop yields. When asked about other methods he may have used, Dr. Seeley

You start with a skillset, it is required.  Based on my education, my training, my experience, and my knowledge and apply that to defining for that specific block and that specific crop what the reasonably expected yield would be for each of the years involved.

Now that gives you the yield portion of the equation.  In addition to that, you have to deal with the quality and you have to define, for example, you have to define the grade and the grade characteristics because and the quality and the quality [sic] characteristics because they determine the value per pound.

THE COURT:  Dr. Seeley, are you explaining to me the before and after?

THE WITNESS: Well, that -- right.  That is how you arrive at the before. You do that for the -- and apply that to establish what you have achieved or what you will.  That is your projection base.  And then from that you compare that to the after the damage. You make a similar assessment and calculation and then you compare the results of the before damage versus the after damage.

(Id. at 9-10.)  This general explanation does not adequately describe Dr. Seeley's methodology.

Dr. Seeley does not explain the before-and-after method in detail or how the method leads to his

Expected Yield and Actual Yield numbers. Dr. Seeley merely testified that he used his

experience to reach his conclusions.  When asked where the court could look to find his

calculations based on the before-and-after method, Dr. Seeley said that his calculations are

reflected in his spreadsheets.  (Id. at 12.)  The spreadsheets, however, only give Dr. Seeley's final

numbers; they do not explain how he reached them.

Throughout the hearing, in response to questions from counsel and the court, Dr. Seeley

did provide some additional detail about his before-and-after numbers, but not enough to

establish the steps he followed or the reliability of his methodology.

---

confirmed that he did not cite other methods in his report and did not use other methods.  (Hr'g Tr. Vol. II at 10-12.)  In response to a question about the statistical forecast method, Dr. Seeley stated that his "calculations are based in statistics" (id. at 11), but Dr. Seeley never testified that he used any method other than the before-and-after method.

### 1.      Dr. Seeley's "Before" Numbers

After giving the general statement above to describe his methodology, Dr. Seeley attempted to further explain how he reached his "before" numbers for the baseline state of the tart cherry crops.  Dr. Seeley quoted a statement from his rebuttal report, which reads, "The bottom line is that the approach I chose, namely, judge a block by its present production, the state or condition of the trees, and future of the variety in terms of market potential, and other factors pertinent to that block is the most accurate approach." (Seeley Rebuttal Report at 25, Dkt. No. 55-5; Hr'g Tr. Vol. II at 18.)  Dr. Seeley later added that his final step was to identify and test his assumptions.  (Hr'g Tr. Vol. II at 29.)  In response to questions about each step in this process, Dr. Seeley confirmed that he has not provided the underlying data to support his calculations.

### a.      Present Production

To determine the present production of the tart cherry trees at Fowers Fruit Ranch, Dr. Seeley explained that he was not involved before BTN products were applied, so he used "comparable blocks in the immediate area which had the same variety, cultivar and site characteristics and generally the same management."  (Id. at 19.)  Dr. Seeley testified about the data that he collected on comparable crops:

> Q.      (By Mr. Johnson) And did you -- where -- where in your reports is that before data?  Where does the court go to find this data on the condition of the trees?
>
> A.      The court or the experts for the defendant?
>
> Q.      How about anyone reading any of your Rule 26 reports?
>
> A.      Okay.
>
> THE COURT:  Me.

THE WITNESS:  The data is not there.  As I said, it had to be comparable block comparisons which, again, is the standard of the industries involved.

THE COURT:  Okay.  And in your reports, where is that comparable info so that when I'm reviewing all of this, you used comparable blocks to make your decisions about what it was before if it hadn't been used.  Any particular area where I would have found them or is that just where you say in your spreadsheets without -- is that sort of --

THE WITNESS: That would be -- that would be the source, yes.

THE COURT:  Okay.

. . .

Q.      Okay.  Now, so let's go back to the first of your four criteria that you used to predict future growth, judge a block by its present production.  When you did that, did you utilize your knowledge of the present production of neighboring farms?

A.      That is correct.

Q.      Did you provide that data on those neighboring farms in your reports?

A.      I did not provide it.

Q.      And then that was based on your own personal knowledge, observation, and training, correct?

A.      Correct.

(Id. at 19-21; see also id. at 65 (data from comparison orchards is "not in the report").)

Bio Tech's counsel later asked how another person could replicate Dr. Seeley's analysis

of comparable orchards without the underlying data.  Dr. Seeley replied,

By retaining experts who were by education, experience, and training familiar with the specific crops that were involved, and then having them put forth the effort to gain, to acquire the necessary data.  For example, a well-trained expert who wanted to know what a comparable block would produce on any one given year could request permission to be there during the harvest procedure and determine that.

If you couldn't get the procedure, most -- almost all of the blocks in that industry have a county road close to it and someone who was thoroughly familiar with the harvest system and practices could from a distance, over a period of time, count the number of bins harvested per tree, and those bins, each one of them, would contain approximately a thousand pounds. And it was a question of having the experts who were truly qualified to make those opinions in those crops put forth that effort.

I was asked in my deposition if they could replicate it and my answer was no, because they hadn't done any of that in the intervening four years between the damage and the date of my deposition. And that is still my position.

(Id. at 66.)

In sum, Dr. Seeley has not provided the data he collected from comparable orchards, despite the fact that this data was critical to his opinions. To collect the same data, one would either need to know the orchards' productivity from experience or monitor each orchard in an attempt to independently count harvested fruit. Although Dr. Seeley did not feel that he could provide the comparison data because it belonged to his clients who operate the orchards (id. at 55), Dr. Seeley has not even disclosed which neighboring orchards he evaluated, what he was looking for, with whom he spoke, what records he reviewed, or how he controlled for differences between the orchards. Dr. Seeley has not provided any data to show that the neighboring orchards were in the same condition as the Fowers' orchard or other records to demonstrate that the orchards produced similar crop yields or were otherwise materially similar. Without this underlying data, the court cannot test or verify the accuracy of Dr. Seeley's analysis.

**b.     State or Condition of Trees**

For state or condition of the trees, Dr. Seeley testified that an expert estimating future crop yields must consider a tree's productive life. According to Dr. Seeley, "there is no objective published data relating to the useful productive life of tart cherry trees in Utah." (Id. at 49.) And

although a tart cherry tree's productivity begins to decline at some point, Dr. Seeley did not identify the factors that lead to declining productivity. (<u>Id.</u> at 50.) He merely stated that he can use his experience and knowledge to consider a tree's productivity in his calculations. (<u>Id.</u>)

Dr. Seeley also testified that the lifespan of a tree is significant but, again, relied on his own experience when asked to identify supporting data.

> Q. (By Mr. Johnson) And in your reports, is there any data on the lifespan of the -- of the trees in either the Genes Block or House Block?
>
> A. That -- that is there -- there are discussions about the planting longevity in general, and there is the information in the spreadsheets that is specific to those blocks.
>
> Q. Sir, I'm sorry, maybe my question wasn't clear. I'm asking about objective data. Do you have any objective data that you cite to in any of your reports on the lifespan of the trees?
>
> A. I believe I am qualified to make that judgment hence that is objective data.

(<u>Id.</u> at 20-21.)

Other than this brief testimony about tree productivity and lifespan, Dr. Seeley did not provide any additional information to show how he accounts for the state or condition of tart cherry trees.

### c.    Market Potential

Dr. Seeley's testimony about market potential was also limited:

> Q. When you determined the future of the variety in terms of market potential, anywhere in your reports do you support your determination in that respect with any published data on future markets for any of the fruits that you looked at?
>
> A. You're asking for did I include references? No.
>
> Q. Again, this was your – based on your personal opinion?

-14-

A.      It is based on my personal knowledge.

(Id. at 21.)  Dr. Seeley later repeated that his consideration of market potential was based on his

knowledge of the tart cherry market. (Id. at 31.)

Dr. Seeley does not explain how his knowledge of market potential affected his analysis

or whether he confirmed his personal knowledge by referring to industry materials.  Indeed, Dr.

Seeley does not even articulate his conclusions about the market potential for tart cherries. The

court cannot conclude that the opinions are reliable where the opinions have not been clearly

stated and where Dr. Seeley has not identified any objective sources that support his conclusions.

### d.      Other Factors

Dr. Seeley stated in his report and later testified that he considered "other factors" to

determine the pre-BTN state of the tart cherry trees.  But Dr. Seeley never identified specific

factors and did not explain how those factors affected his analysis.

### e.      Assumptions

Finally, although Dr. Seeley specifically testified that he concludes his process by

identifying and testing his assumptions, when asked whether his report provides a "trail"

showing that he tested his assumptions related to crop yields, Dr. Seeley stated, "There isn't a

trail there."  (Id. at 51.)

In sum, Dr. Seeley has described his methodology in very general terms, but when asked

about each step that he allegedly took to determine the "before" condition of Fowers Fruit

Ranch's tart cherry trees, Dr. Seeley did not give any objective information.  Indeed, Dr. Seeley

consistently confirmed that he has not identified his process in his report or provided the

underlying data that would allow someone else to replicate his methodology.

-15-

2.      Dr. Seeley's "After" Numbers

To establish crop yields after the application of BTN+, Dr. Seeley again provides final numbers without explaining the basis for his conclusions.

For example, Dr. Seeley used the Actual Yield numbers for 2009 as the baseline for his future yield projections. Even though 2009 was a heavy crop year for tart cherries, Dr. Seeley maintains that it provides a good baseline because most orchards were at or near the theoretical production yield. In addition, Dr. Seeley testified that he compared Fowers Fruit Ranch's 2009 production records with the Cherry Industry Administrative Board's (CIAB) audited figures for the orchard, to confirm his estimates. (Id. at 23.) Dr. Seeley has not provided any of this data—including data from neighboring orchards or from the CIAB.

To further support his use of 2009 as the baseline year, Dr. Seeley explained that he did not use historical records before 2009 because he made an "adjustment upward to account for the increase in productive potential of that block." (Id. at 25.) In other words, using historical data would have included years before the trees actually became productive and before they reached maturity. (Id.) Moreover, according to Dr. Seeley, past performance does not necessarily determine future production. (Id. at 32.) Dr. Seeley instead asserts that the tart cherry market has improved since 2005 and will continue on the same trajectory. (Id. at 33.)

Although Dr. Seeley may be correct about the productivity of tart cherry trees and about a consistently improving tart cherry market, the market trend is not explained in his reports, and Dr. Seeley has not cited objective sources that document the trend. When asked for such materials, Dr. Seeley merely stated that "[t]hey are available online and in research publications," but Dr. Seeley does not "provide to anyone reading [his] Rule 26 report the data upon which

-16-

those assumptions are based." (Id. at 33.)  Without the data to look at, the court cannot discern whether 2009 is the appropriate year from which future yields should be projected.

Dr. Seeley's post-2009 estimates are also impossible to verify.  For 2010, Dr. Seeley examined the Fowers Fruit Ranch production records and testified that because the trees had been damaged by the time he began his analysis, he could not use the actual numbers to project expected yields.  As a result, Dr. Seeley again looked at neighboring orchards for comparison data.  According to Dr. Seeley, neighboring orchards produced 23,000,000 pounds in 2010, which was down from 31,000,000 in 2009, a difference of about 26%.  (Id. at 24.)  So Dr. Seeley took the actual numbers from 2009 and discounted by 26% to calculate the Expected Yield for 2010.  (Id. at 23-24.)  Dr. Seeley does not provide the data to confirm the neighboring orchards' production numbers for 2010 or other records to demonstrate that Fowers Fruit Ranch was producing at levels similar to neighboring orchards.

For 2011, Dr. Seeley testified that statewide production rates for cherries exceeded production rates for 2009 and he adjusted his figures accordingly.  (Id. at 24-25.)  Dr. Seeley has not provided data showing Utah production rates.

As for the period after 2011, Dr. Seeley did not have actual production numbers, so he estimated yields by looking at the age of trees, pruning, cultivating methods, and productive potential of the tree. (Id. at 24.)  Using 2009 as the baseline, Dr. Seeley projected what he believed Fowers Fruit Ranch could have reasonably expected in crop yields but for the damage caused by Bio Tech's products.  (Id. at 24-26.)  Despite acknowledging that production varies widely from year to year, Dr. Seeley did not describe how he calculated future crop yields and he did not state whether or how he accounted for the variety of factors that may affect crop yields.

-17-

Dr. Seeley did consider future weather conditions but testified as follows:

Q.      And do I understand correctly that this expected yield number contains some discount or reduction for adverse weather conditions in the future?

A.      It does.

Q.      All right.  And where in your report can the court review the method by which you calculated your weather discount?

A.      It is not there.

Q.      It is not there.  You just -- you just came up with one based on your personal experience, correct?

A.      It is -- it is an industry usual and ordinary practices discount.

Q.      Where in your report do you document that?

A.      I didn't.

(Id. at 48; see also id. at 67 ("Number one, discount isn't just a weather discount, but that

information was not contained in my report.").)

In response to questions from Fowers Fruit Ranch's counsel, Dr. Seeley gave a slightly

more detailed description of his weather discount but still did not fully describe his process:

For example, there is tree loss within a block, for example, and in Fowers' case eight-year old orchards those in Joe's Block they -- they have less than one percent of the trees unoccupied.  And so in a producing orchard, that is the first thing you look at. You determine the number of missing trees.  And as a percentage of the total tree population per acre, you put that into the discount.  Then the average estimated frost loss goes into the discount.  For example, in Utah in the last six years, there has been very little frost loss.  I would normally put, depending on the site, from 15 to 20. There are some sites that I have evaluated where I have raised that factor to as high as 30 percent.

And so you go through the risk factors, you know, the risk of the wind blowing fruit off the trees at Fowers is minimal because of topography.  So that risk factor would be very, very small.  And then you add those risk factors up and as long as your -- the total of those in terms of percent is less than 20 percent, you have already covered

-18-

> that.  And it is a lot better economically to be conservative by -- to be conservative
> than it is to be overly optimistic.  And that is the purpose of the risk factor.

(Id. at 57.)

Beyond this testimony about a weather discount, Dr. Seeley has not provided anything from which the court can conclude that he properly considered relevant factors in calculating future crop yields.  From a review of Dr. Seeley's reports and his testimony, it is not clear whether or to what extent Dr. Seeley adjusted his calculations for variables that may negatively affect growers.

### B.      Future Crop Prices

Similar to his crop yield numbers, Dr. Seeley used the Fowers Fruit Ranch records and other industry sources to identify the actual price per pound for tart cherries from 2009 through 2012.  (Id. at 22.)  Beginning with 2013, Dr. Seeley projected prices for tart cherries through 2034.  (Id.) But in his reports and at the Daubert hearing, Dr. Seeley did not describe how he reached his projected prices.  Dr. Seeley testified:

> Q.      Now, maybe the best way to get at the situation with respect to your opinion
> is to talk about the future pricing for the Fowers tart cherries at an average of 82 cents
> a pound.  I want you to point out to the court where in your report you provide the
> historical data for what the price per pound was of tart cherries in Utah over the last
> ten years?
>
> A.      I --
>
> Q.      Is it in your report?
>
> A.      No.
>
> Q.      All right.  Now, it is true, is it not, because we just discussed that the price of
> tart cherries depends on substantial part on the existing supply and demand each
> year?

A.      That is correct.

Q.      And isn't it true that Michigan harvests its tart cherries before Utah does?

A.      That is not correct.  The northern portion of Michigan is actually harvested after, and that is where most of it is centered.

Q.      But the price of tart cherries -- the production of cherries in Michigan affects the price of cherries in Utah?

A.      Oh, definitely.  That is the purpose of the CIAB and the marketing order.

Q.      And your determination of a future price of 82 cents per pound for tart cherries wasn't taken from any study done by the Cherry Industry Administrative Board, was it?

A.      That -- it was not.

Q.      That is not my question.  It wasn't based on any published studies, correct?

A.      That was not.

Q.      All right.  And it wasn't based on any government or industry tables?

A.      That is correct.

Q.      All right.  Rather, your 82 cents per pound is based on your professional opinion of, one, the quality of Fowers cherries, that is what you call their pit scores; correct?

A.      It is.  It is more than pit scores, it is their overall grade scores.

Q.      Their overall grade scores?

A.      And other nongraded factors.

(Id. at 33-35.)

Despite the fact that his price estimates are based on pit scores, grade scores, and other

non-graded factors, Dr. Seeley does not provide the criteria for pit scores or overall grade scores.

And he does not identify the "other nongraded factors" that contributed to his estimated crop

price of eighty-two cents per pound.  Bio Tech's counsel later asked, "Can you show the court

where in your report you identify the criteria for determining how to establish a score for a tart

cherry? Where could Judge Campbell go so she can understand what you mean when you say the

Fowers tart cherries have superior scores?"  (Id. at 36.)  Dr. Seeley responded that he "did not

cite the state inspection standards" and did not explain the standards at all in his report.  (Id.)

     Bio Tech's counsel continued:

> Q.    All right.  So where -- can you show the court where in your report there is
> some government data that provides us with pit scores or grades or rankings for the
> Fowers Farms Fruit, is there any?
>
> A.    Specifically government data?
>
> Q.    Yes?
>
> A.    No.
>
> Q.    So the judgment about Fowers Fruit you just told the court about that it is
> superior and has these high scores, it's great stuff, it is going to sell, that is based on
> your personal opinion, correct?
>
> A.    My personal opinion and the fact that as manager of -- as general manager of
> Farm Management Properties in Southern Utah for a number of years, I actually had
> experience with a little over, well, approximately 800 acres of tart cherries.  One
> small block which was located just across the road from Fowers, just across the road
> and south, and I packed that fruit so I am aware of the unique site characteristics that
> make it so that you can pack a much higher score cherry from that particular site than
> you can elsewhere.
>
> Q.    Thank you, Dr. Seeley.  Do I understand then that there is no objective criteria
> or any kind of objective measures that are in your report that would allow anybody
> else to look at the Fowers fruit and test them against this objective criteria, it is based
> on your personal experience, correct?  Is there any objective criteria in your report?
>
> A.    Not cited in the report.

(Id. at 37-38.)

While there may be data to support Dr. Seeley's opinions, Fowers Fruit Ranch had the responsibility to provide that data so Dr. Seeley's opinions can be evaluated by the court and by Bio Tech. Without the underlying data, Dr. Seeley's opinions cannot be tested. The court and Bio Tech cannot evaluate whether Dr. Seeley used correct criteria, looked at relevant site characteristics, and applied the criteria to the cherries harvested by Fowers Fruit Ranch. Dr. Seeley may not simply assert that the data is available without providing it or identifying any source where the court or opposing counsel may look for the data.[8]

In addition to his opinions about tart cherry scores, Dr. Seeley also opined that Fowers Fruit Ranch could charge higher prices for its cherries based on its five-plus-one packing method. Bio Tech's counsel asked the following questions about this opinion:

> Q.      Two, how the Fowers Farm is going to sell its cherries, this new marketing approach where they're going to take a big plastic container and they're going to put 20 pounds of tart cherries in it, they're going to put five pounds of sugar over the top and I think you call it the five plus one?
>
> A.      That -- that has -- that has been the industry kind of standard pack for at least 50 years.
>
> Q.      But it is your opinion, is it not, that Fowers will make great in-roads into this market using this 20 pounds of tart cherries in the container and they put sugar over the top; correct?
>
> A.      That is correct.
>
> Q.      And you also believe that because you don't think other competitors can respond to these -- to the superior quality of the Fowers' cherries; correct?

_____

[8] At the final argument on this motion, Fowers Fruit Ranch's counsel represented that Dr. Seeley explained in his deposition testimony the reasons he used eighty-two cents per pound as his baseline price. But the relevant portion of Dr. Seeley's deposition was not cited in the parties' briefing and was not provided to the court. So the court will not consider counsel's statements.

A.    For good reason, that is correct.

(Id. at 35-36.)

In sum, Dr. Seeley estimates that Fowers Fruit Ranch will be able to demand eighty-two cents per pound for its tart cherries and that price will remain stable for the foreseeable future. This opinion is based on Dr. Seeley's assessment of the quality of Fowers Fruit Ranch's cherries and on the fact that the orchard uses a five-plus-one packing method, which involves packing twenty pounds of cherries with five pounds of sugar on top.  Although Dr. Seeley opines that this method gives Fowers Fruit Ranch a competitive advantage over other growers, Dr. Seeley admitted that his opinions about the quality of the cherries is not supported by data.  (Id. at 36.) And Dr. Seeley could not identify any barriers that would prevent other growers from using the five-to-one method.  (Id. at 39-40.)  In addition, as illustrated by Dr. Seeley's testimony above, he has not identified the objective criteria for grading cherries and has not provided data showing the grades that Fowers Fruit Ranch has received for its tart cherries.  (Id. at 37.)  In short, Dr. Seeley has not provided any relevant information that would allow a person to test his opinions about the future prices that Fowers Fruit Ranch may demand for its tart cherries.

### C.    Lost Revenues

The final opinions at issue are Dr. Seeley's conclusions about lost revenues.  Dr. Seeley confirmed that "[t]he total revenue column is based on the number in the packed pounds column times the number in the value unit column." (Hr'g Tr. Vol. II at 5.)  In other words, revenue loss was calculated by multiplying "expected yield times the value per unit minus the revenue actually received."  (Id.)  The lost revenue projections represent losses "sustained by the Fowers over and

-23-

above the revenue they're going to get" (i.e., "in addition to the revenue they're going to earn any way").  (Id. at 5-6.)

Because Dr. Seeley's lost revenues calculations are based on his numbers for crop yields and crop prices, they suffer from the same deficiencies discussed above for those categories.  Dr. Seeley has not adequately disclosed or provided the underlying facts and data that form the basis for his opinions.

With the information provided in Dr. Seeley's reports and from his testimony at the Daubert hearing, the court cannot verify Dr. Seeley's calculations of crop yields, crop prices, and lost revenues for tart cherries.  As a result, the court cannot find that Dr. Seeley's opinions are "the product of reliable principles and methods."  Fed. R. Evid. 702(b).  Dr. Seeley may have followed industry-accepted methods in reaching his opinions.  But the court does not know if he did, because he did not document or describe his methodology in a way that allows for meaningful testing and evaluation.  Dr. Seeley's conclusory statements that he followed accepted methods are not enough.  Fowers Fruit Ranch must show that Dr. Seeley's opinions are in fact based on accepted methods and supported by sufficient facts and data.  Fowers Fruit Ranch has not met its burden for Dr. Seeley's opinions on crop yields, future crop prices, and lost revenues for tart cherries.  As a result, Dr. Seeley may not testify about these topics.

## CONCLUSION

For the foregoing reasons, the court GRANTS Bio Tech's Motion to Strike Expert Witness Reports of Dr. Earl J. Seeley (Dkt. No. 55) in part.  Dr. Seeley may not offer expert opinion testimony about crop yields, future crop prices, or lost revenues for tart cherries.  Dr. Seeley may testify about the other topics adequately disclosed in his reports, including physical

damage to Fowers Fruit Ranch's orchard, causation, the costs to restore damaged sections of the orchard, rebuttal of opinions offered by Bio Tech's experts, and projected losses for crops other than tart cherries.

SO ORDERED this 11th day of May, 2015.

BY THE COURT:

_____
TENA CAMPBELL
United States District Judge